

# In the Missouri Court of Appeals
# Eastern District

**DIVISION THREE**

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED112281 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of Shelby County |
| v. | ) | Cause No. 21SB-CR00149-01 |
| | ) | |
| SARA E. DODD, | ) | Honorable Frederick P. Tucker |
| | ) | |
| Appellant. | ) | Filed: April 22, 2025 |

## Introduction

Appellant Sara Dodd was found guilty of one count of statutory rape in the first degree and one count of child molestation in the first degree, and was sentenced to a total of 45 years imprisonment. In three points on appeal, Appellant challenges the logical and legal relevance of photographs admitted during trial and the circuit court's denial of her motion to sever her trial from Codefendant's. We affirm the circuit court's judgment.

## Background

The sufficiency of the evidence is not challenged on appeal. Viewed in the light most favorable to the verdict, the relevant evidence presented at trial is as follows. *State v. Stewart*, 560 S.W.3d 531, 532-33 (Mo. banc 2018).

On September 18, 2020, Victim, who was six years old at that time, arrived at school "acting more sad than usual" and holding her vaginal area in pain. When questioned by school

staff, Victim first reported that she fell on the bus that morning, and then later said she hurt because her mother made her take a shower that morning with her younger brother, who hits and tickles her bottom a lot. Victim told the school nurse that other people in her house also hit and tickle her private areas, and that sometimes her family would "go into a trance," and would "hurt and touch her there," indicating her private areas, and that her hands had superpowers to stop them from touching her, but it did not always work. While the nurse and the school principal were assisting Victim with using the bathroom, which was a common occurrence as Victim dealt with incontinence and wore pull-ups, they noticed blood in Victim's pull-up and on the toilet seat. The school made a hotline call to the Children's Division for possible sexual abuse.

Later that day, a Children's Division investigator followed up on the hotline call and did a home visit at Appellant and Codefendant's home. Appellant and Codefendant are the parents of Victim and four other children. While at the home, the investigator observed unsanitary conditions inside the home, despite the fact that the family had a recent family-centered services case that included an intensive in-home services component based on prior hotlines for lice and bedbugs. As a result of the investigation, the investigator decided to remove all of the children from the home and immediately took them to an urgent care, where it was determined that all of the children had lice and one child had open sores on his legs.

Once Victim was moved to foster care, she slowly began disclosing abuse committed by Appellant and Codefendant. In November 2020, Victim disclosed to a child psychiatrist that Codefendant had touched her private areas on more than 10 occasions. The psychiatrist diagnosed Victim with chronic post-traumatic stress disorder, secondary to complex trauma; attention deficit hyperactivity disorder; oppositional defiant disorder; and encopresis and

enuresis, or incontinence. The psychiatrist testified at trial that Victim's diagnoses can be linked to sexual abuse.

Later in November 2020, while Victim's first foster mother ("First Foster Mother") was helping Victim clean herself up after she had accidentally defecated on herself, Victim inserted her fingers into her anus and defecated on herself again. When First Foster Mother asked Victim why she had done that, Victim stated "I just miss my daddy sometimes," and disclosed that Codefendant would stick his fingers into her vagina and anus. Victim further disclosed that Codefendant would rub his penis and rub and kiss Victim's vagina. On another occasion, while First Foster Mother was giving Victim a bath, Victim stated that "mommies don't give girls baths," and that "daddies give little girls baths," and disclosed how Codefendant would rub her vagina when he gave her baths.

In December 2020, a respite foster mother ("Respite Foster Mother") was assisting First Foster Mother with Victim's bedtime routine when Victim began recounting prior disclosures made about Codefendant. When Respite Foster Mother asked where Appellant was when Codefendant was abusing her, Victim told them that Appellant was also in the room while the abuse was happening and that Appellant was doing "the same things as daddy." Victim then disclosed that Appellant and Codefendant would hold her down and that "she would scream loud enough for the whole world to hear but nobody came."

In January 2021, Victim gave her first Child Advocacy Center ("CAC") interview, where she disclosed that Codefendant put his penis and fingers in her vagina and that it hurt. Victim told the interviewer that Appellant was in bed with her and Codefendant when it happened but that Appellant was asleep and did not wake up.

In February 2021, Victim had a sexual assault forensic examination after she had disclosed that an adult had put his fingers and penis in her vagina.

In March 2021, after moving foster homes, Victim told her permanent foster mother ("Permanent Foster Mother") that Codefendant used to put his penis in her anus when she slept in the bed with Codefendant and Appellant. Victim stated that Appellant told him not to do that, but that Codefendant refused and told Appellant to shut up. In May 2021, Victim told Permanent Foster Mother that Codefendant and Appellant would watch bad movies on Codefendant's phone, and then Appellant would teach Victim "how to be a big girl for when she got married" and "how to be a big girl with daddy…with her vagina." In July 2021, Victim further disclosed that Appellant once called her in sick to school so that Appellant, Codefendant, Victim's younger sister, and Victim could have a "girls' day." Victim reported that she became afraid and tried to hide under the bed, but that Codefendant pulled her out from underneath the bed. Victim told Permanent Foster Mother that Codefendant and Appellant then held her by the neck while they spanked her with a belt. Victim stated that Codefendant then raped her while Appellant held her down, covered her mouth, told her not to scream, and threatened that if Victim ever told anybody, Appellant and Codefendant would go to jail and Victim would not have any parents or a place to live or food to eat.

In August 2021, Victim gave a second CAC interview, during which she disclosed that Appellant held her hand over Victim's mouth while Codefendant put his penis in Victim's vagina and his fingers in Victim's anus.

Prior to trial, the State filed a motion to consolidate Appellant's and Codefendant's cases. Appellant filed a motion to sever, arguing that a joint trial would result in prejudice because the parties had adverse defenses which could impede her Fifth Amendment right to remain silent.

4

The circuit court denied the motion. The parties stipulated to the admission of evidence pursuant to Section 491.075, which allowed nine witnesses to testify to Victim's disclosures.[1]

Appellant was found guilty as charged following a jury trial, and was sentenced to consecutive terms of 30 years for statutory rape and 15 years for child molestation, for a total of 45 years. This appeal follows.

### Points I & II: Admission of Photographs of Appellant's House

In her first and second points on appeal, Appellant argues that the circuit court erred in overruling her objection to the admission of photographs of the unclean state of Appellant and Codefendant's home at the time Victim and her siblings were removed from the home on September 18, 2020, because the photographs lacked logical and legal relevance and were highly prejudicial.[2] Specifically, Appellant argues that the photographs were irrelevant because they did not help prove any element of the charges of statutory rape or child molestation. Therefore, the potential for unfair prejudice outweighed any probative value in that the images led the jury to believe Appellant was a bad mother and must have been guilty of the charged crimes. Appellant further argues that the prejudice caused by the admission of the photographs warrants a reversal because the photographs so misled the jury on the pertinent issues that there is a reasonable probability that Appellant would have been acquitted but for the erroneously admitted photographs.

---

[1] All Section References are to the Missouri Revised Statutes (2020).

[2] Appellant's first and second points relied on posit that the "[t]he trial court erred in overruling Ms. Dodd's objections made during [the investigator's] testimony regarding the unclean condition of the Dodd family residence, and to the admission of the State's Exhibits 3 through 20A," however, Appellant's discussions of both points do not include any argument related to the investigator's testimony regarding the condition of the home. This Court must therefore presume that such argument is abandoned.

"The general rule in Missouri is that evidence must be both logically and legally relevant in order to be admissible." *State v. Tisius*, 92 S.W.3d 751, 760 (Mo. banc 2002). "Evidence is logically relevant if it tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence, or if it tends to corroborate evidence which itself is relevant and bears on the principal issue of the case." *Id*. (quoting *State v. Mathews*, 33 S.W.3d 658, 661 (Mo. App. S.D. 2000)). "Logical relevance is a very low threshold." *Kappel v. Prater*, 599 S.W.3d 189, 193 (Mo. banc 2020) (quoting *State v. Anderson*, 76 S.W.3d 275, 277 (Mo. banc 2002)). "The determination of legal relevance—the balancing of the probative value of the proffered evidence against its prejudicial effect on the jury—rests within the sound discretion of the trial court." *Id*. "If the prejudice of the logically relevant evidence outweighs its probative value, it should be excluded." *State v. Prince*, 534 S.W.3d 813, 817 (Mo. banc 2017). We review the admission of evidence for prejudice, not mere error, and will reverse only "if the error so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion without the error." *State v. Minor*, 648 S.W.3d 721, 733 (Mo. banc 2022).

There are 36 photographs at issue, including 18 unique images and 18 enlarged duplicates, which were taken by the Children's Division investigator and depict the inside and outside of Appellant and Codefendant's home during the investigator's walkthrough on September 18, 2020, which precipitated the children being taken into protective custody on that day. The photographs were admitted over Appellant and Codefendant's objections for relevance during the investigator's testimony. The photographs generally show unsanitary conditions

within the home, including trash, feces, blood, stagnant water, bedbugs, dirty carpeting, and a dirty kitchen.

Here, even if the evidence was inadmissible for relevance, which this Court need not determine, reversal is not warranted because Appellant has not demonstrated that she would have been acquitted but for the admission of the photographs in light of the overwhelming evidence of guilt against her. "In a criminal trial involving improperly admitted evidence, the test for prejudice is whether the error was outcome-determinative." *State v. Denham*, 686 S.W.3d 357, 373 (Mo. App. W.D. 2024) (quoting *State v. Thomas*, 628 S.W.3d 686, 691 (Mo. App. E.D. 2021)). "A finding of outcome-determinative prejudice expresses a judicial conclusion that the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all evidence properly admitted, there is a reasonable probability that the jury would have acquitted but for the erroneously admitted evidence." *Id*. (quoting *State v. Thigpen*, 548 S.W.3d 302, 319 (Mo. App. E.D. 2017)). "Prejudice is not outcome-determinative when evidence of guilt is otherwise overwhelming." *Id*. (quoting *State v. Duncan*, 397 S.W.3d 541, 544 (Mo. App. E.D. 2013)).

At trial, the jury heard from multiple witnesses who described Victim's detailed disclosures of Appellant's conduct in aiding Codefendant's sexual abuse against Victim. Both the school nurse and the school principal testified that Victim told them that her family would go into a "trance" and that they would hurt her and touch her "there," indicating her groin area, and that sometimes her hands had "super powers" to stop it, but "sometimes it doesn't work and they hurt her there." The school nurse and principal also testified to Victim's disclosure that, on the morning of September 18, 2020, after they discovered blood in Victim's pull-up and on the toilet

seat after Victim used the restroom, Victim disclosed that Appellant had given her a shower that morning because "she hurt down there."

Next, Victim's foster mothers testified to Victim's various disclosures regarding Appellant's role in the abuse committed against Victim. First, Respite Foster Mother testified to Victim's disclosure that Appellant was not only present while Codefendant abused Victim, but that Appellant was doing "the same things as daddy," as well as Victim's disclosure that Appellant and Codefendant would hold her down and cover her mouth while Codefendant abused and raped her, and that Victim would "scream loud enough for the whole world to hear but nobody came." Permanent Foster Mother testified to additional disclosures, including that Victim was made to sleep with Appellant and Codefendant, which she did not like, and that Codefendant would put his penis in her anus, even when Appellant told him to stop. Permanent Foster Mother further testified to Victim's disclosure that Codefendant and Appellant would watch porn, and then Appellant would teach Victim "how to be a big girl for when she got married" and "how to be a big girl with daddy…with her vagina." Finally, Permanent Foster Mother testified to Victim's disclosure about the day Appellant called her in sick to school for a "girls' day," and that, when she became afraid and tried to hide under the bed, Codefendant pulled her out from underneath the bed and then he and Appellant held her by the neck while they spanked her with a belt. Victim disclosed that Codefendant then raped her while Appellant held her down, covered her mouth, told her not to scream, and threatened her. Permanent Foster Mother described how Victim referred to the abuse as if it occurred frequently rather than incidentally.

Victim's two CAC interviews were also admitted into evidence and played for the jury, in which Victim specifically described an instance when Codefendant put his penis and fingers

in her vagina and anus while Appellant was asleep in the bed with them, and the instance where Appellant held her down and put her hand over Victim's mouth to keep her from screaming while Codefendant raped her.

Additionally, extensive evidence was admitted describing the emotional and physical impact of the abuse on Victim, including testimony from the child psychiatrist who treated Victim explaining how Victim had been diagnosed with post-traumatic stress disorder secondary to complex trauma, oppositional defiant disorder, and encopresis and enuresis, or incontinence, all of which can stem from trauma or sexual abuse. Multiple witnesses testified to Victim's difficulties with incontinence, which resulted in between 15-20 accidents per day, which was likely the result of sexual abuse. Finally, Victim's own statements demonstrated sexual knowledge far beyond what would be expected of or appropriate for a six-year-old child, with no other reasonable explanations provided for how she learned such information.

On this record, this Court is unpersuaded that the photographs of Appellant's home so influenced the jury that there is a reasonable probability that Appellant would not have been found guilty but for their admission, as the evidence of guilt is undeniably overwhelming. *See Denham*, 686 S.W.3d at 373. Accordingly, Points I and II are denied.

**Point III: Motion to Sever Trial**

In her third and final point on appeal, Appellant argues that the circuit court erred in failing to grant her motion to sever her trial from Codefendant's because Codefendant's additional charge of child molestation for touching Victim's anus with his hand allowed for the introduction of evidence that would have been inadmissible against Appellant in a separate trial. Appellant posits that she was prejudiced by the joint trial because the evidence related to the charge only against Codefendant was not only inadmissible specifically against her, but it also

muddled the evidence related to when Appellant acted with Codefendant, and the jury was thus unable to compartmentalize the evidence related only to Appellant.

While Appellant argues that the circuit court's denial of her motion to sever was in error due to prejudice caused by Codefendant's additional charge, this argument was not properly preserved, as Appellant raised different arguments in both her motion to sever and her motion for new trial than she raises now on appeal.

Appellant's pretrial motion to sever raised two potential sources of prejudice: the possibility of antagonistic defenses with Codefendant and that a joint trial could prejudice her Fifth Amendment right not to testify against herself. In her motion for new trial, Appellant argued that prejudice was created by joinder with Codefendant, who had an additional charge, because joinder had occurred only two months before trial. Now on appeal, Appellant has abandoned the arguments raised in the motions below and raises entirely new arguments related to Codefendant's additional charge resulting in prejudice from inadmissible evidence against Appellant and potential confusion of the evidence by the jury. Because these arguments were not raised in the motion to sever, at trial during the admission of evidence, nor in the motion for a new trial, these arguments are not preserved and are reviewable only for plain error.

This Court does not generally review unpreserved claims of error. *State v. Brandolese*, 601 S.W.3d 519, 526 (Mo. banc 2020). Rule 30.20 provides an exception allowing that "plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom."[3] *Id*. (quoting Rule 30.20). Rule 30.20 makes clear that plain error review is a discretionary, two-step process. *See*

---

[3] All Rule references are to the Missouri Supreme Court Rules (2023), unless otherwise indicated.

10

*Minor*, 648 S.W. at 731. The first step is to determine whether the claim of error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted. *State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc 2009). Plain errors are those that are evident, obvious, and clear. *Id*. In the absence of such a determination, an appellate court should decline to review for plain error. *See Brandolese*, 601 S.W.3d at 526. If plain error is found on the face of the claim, then the court may proceed to the second step to determine whether the claimed error resulted in manifest injustice or miscarriage of justice. *See Baumruk*, 280 S.W.3d at 607.

"The decision to sever a joint trial lies within the sound discretion of the trial court." *State v. Mack*, 624 S.W.3d 436, 452 (Mo. App. E.D. 2021) (quoting *State v. Isa*, 850 S.W.2d 876, 885 (Mo. banc 1993)). "An appellate court will not disturb that ruling unless there is an abuse of discretion resulting in prejudice." *Id.* "The defendant on appeal bears the burden of affirmatively showing that the joint trial prejudiced his right to a fair trial." *Id*. (citing *State v. Denzmore*, 436 S.W.3d 635, 640 (Mo. App. E.D. 2014)).

"Missouri courts generally favor joint trials because they further the interests of justice by avoiding inconsistent verdicts and lead to more accurate assessments of relative culpability—advantages which sometimes operate to the defendant's benefit." *Isa*, 850 S.W.2d at 885 (quoting *Richardson v. Marsh*, 481 U.S. 200, 209-10 (1987)) (internal quotations omitted). Severance is appropriate when "the court finds that the probability for prejudice exists in a joint trial." Section 545.880.2. "A motion to sever is appropriate only where there is a serious risk of compromise of the defendant's rights or the jury's ability to make a reliable judgment about guilt or innocence." *Mack*, 624 S.W.3d at 452. The probability for prejudice exists where:

    (1) At least one but not all of the defendants jointly charged is, if convicted subject to jury assessment of punishment; . . .

11

(2) There is, or may reasonably be expected to be, material and substantial evidence admissible against less than all of the joint defendants;

(3) There exists an out of court statement of a codefendant which makes reference to another of the joint defendants, but is not admissible against that defendant;
. . .

(4) Severance of the joint defendants is necessary to achieve a fair determination of guilt or innocence of any defendant.

Section 545.880; Rule 24.06.

"Severance is required when the proof is such that a jury could not be expected to compartmentalize the evidence as it relates to the separate defendants." *Denzmore*, 436 S.W.3d at 640 (quoting *State v. Oliver*, 791 S.W.2d 782, 786 (Mo. App. E.D. 1990)). The purpose of severance is to "protect defendants in joint trials from being convicted on evidence that would be inadmissible against them in a separate trial." *State v. Ward*, 782 S.W.2d 725, 729 (Mo. App. E.D. 1989). "Severance is not required when a less drastic course, such as the provision of proper jury instructions, will prevent prejudice to the defendant." *Mack*, 624 S.W.3d at 453.

Here, Appellant's unpreserved arguments fail to meet her burden to prove that the denial of her motion to sever resulted in an abuse of discretion, let alone manifest injustice necessary for a finding of plain error. First, contrary to Appellant's conclusory statement that all evidence related to Codefendant's additional charge would be inadmissible against her in a separate trial, the evidence would have been admissible to show a complete and coherent picture of the charged offenses, in that it provided the full context of the abuse being alleged by Victim and the timeline of Victim's various disclosures. *See State v. Miller*, 372 S.W.3d 455, 474 (Mo. banc 2012); *see also Oliver*, 791 S.W.2d at 786 (allowing evidence of kidnapping by codefendant to be introduced in a murder trial under the 'complete story' exception despite implicating defendant in uncharged crime); *State v. Hamilton*, 892 S.W.2d 371 (Mo. App. E.D. 1995) ("The state may paint a complete picture of the crime charged and need not sift and separate the evidence.").

12

Additionally, the evidence would also have been admissible as relevant to Victim's credibility, in that it tended to show consistency in Victim's disclosures as well as Victim's age-inappropriate sexual knowledge. *State v. Shade*, 657 S.W.3d 282, 293 (Mo. App. W.D. 2022) ("Anything that has the legitimate tendency to throw light on the accuracy, truthfulness, and sincerity of a witness is proper for determining the credibility of the witness.").

Appellant next argues that the evidence was complex, confusing to the jury, and therefore prevented the jury from fairly determining guilt. Appellant first points to a potential inconsistency in Victim's testimony, however, Appellant does not identify how a separate trial would make the inconsistencies in a minor's testimony less confusing. *See N.J.K. v. Juvenile Officer*, 139 S.W.3d 250, 257 (Mo. App. W.D. 2004) ("[I]n cases involving such young victims and sensitive and embarrassing subject matter, it is not uncommon for children's accounts of the abuse to contain some variations, contradictions or lapses in memory.") (internal citations omitted). While inconsistencies are a factor in the totality of the circumstances examined to determine admissibility of a child's testimony, *id.* at 256, Appellant stipulated to the admissibility of the testimony, and therefore any inconsistencies more properly go to credibility, *State v. Sprinkle*, 122 S.W.3d 652, 663 (Mo. App. W.D. 2003).

Finally, Appellant argues that prejudice exists because the evidence was not clear as to when the specific acts of child molestation occurred, in that the State failed to clearly distinguish the evidence admissible against Codefendant on the additional charge from the rest of the evidence. Appellant relies on *State v. Denzmore*, where the State used the exact dates the crimes in question occurred as well as emphasized the difference in charges between the two codefendants during trial. 436 S.W.3d at 640. Unlike in *Denzmore*, the crimes at issue here were not isolated incidents that can be readily contained to a single date, but rather a pattern of

ongoing abuse. In the instant case, the State was not required to establish proof beyond a reasonable doubt on which date the abuse occurred, only that it occurred within the date range established in the information. Section 566.032; Section 566.067. Consequentially, the specific date was not relevant to the jury's finding of guilt.

Even if we were to imagine that error occurred here, Instruction No. 11 dashes hope that Appellant would prevail on this argument. Instruction No. 11 directed the jurors to separately consider each count, and the jury is presumed to follow instructions. *Minor*, 648 S.W.3d at 731. Severance is not appropriate when a less drastic measure will suffice. *Isa*, 850 S.W.2d at 885. Accordingly, Appellant has failed to demonstrate that the evidence was outcome determinative, or "so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion but for the erroneously admitted evidence." *State v. Roberts*, 948 S.W.2d 577, 592 (Mo. banc 1997). Thus, Appellant's claim fails under both abuse of discretion and plain error review. Point III is denied.

## Conclusion

For the reasons set forth above, the judgment is affirmed.


_____
Renée D. Hardin-Tammons, J.


Philip M. Hess, P.J., and
Gary M. Gaertner, Jr., J., concur.